# Exhibit E



# ARM LAWYERS

Nicholas J. Masington, III, Esq.
Brett J. Riegel, Esq.*
Joshua B. Goldberg, Esq.
Patrick J. Best, Esq.*+△
Jason R. Costanzo, Esq.*
  *Also licensed in New Jersey
  +Also licensed in Maryland
  △Also licensed in New York

☑ 18 North 8th Street
Stroudsburg, PA 18360
(570) 424-6899 Tel
(484) 544-8625 Fax

☐ 115 E. Broad Street
Bethlehem, PA 18018
(610) 849-2788 Tel
(484) 544-8625 Fax

☐ 202 Delaware Avenue
Palmerton, PA 18071
(484) 765-8140 Tel
(484) 544-8625 Fax

June 26, 2019

Gregory Sturges, Esq.
Greenberg Traurig LLP
1717 Arch Street
Suite 400
Philadelphia, PA  19103

      **Re:  Bainbridge v. U.S. Bank, N.A., et. al.**
           **M.D. Pa. No. 16-cv-00411**

Dear Mr. Sturges:

    In this matter, you have requested that I review the report of Mark S. Pearlstein, Esquire along with relevant documentation and provide a rebuttal opinion as to the Plaintiff's Dragonetti claim at the above term and number.

    In this regard, I have reviewed the following materials:

- Plaintiff's Amended Complaint;
- Defendant's Answer and Affirmative Defenses to the Amended Complaint;
- Plaintiff's Answers to Defendant's Interrogatories;
- Defendant's Objections and Responses to Plaintiff's Interrogatories and Requests for Production and Admission;
- Defendant's Amended response to Request for Admission No. 3;
- Deposition transcripts of Christopher Bainbridge, Kelly Bainbridge, Mark Udren, and Kevin Flannigan along with supporting exhibits;
- Bankruptcy docket number 5:10-bk-09019-JJT;
- Claims Register of bankruptcy docket number 5:10-bk-09019-JJT;
- Report of Mark S. Pearlstein and accompanying exhibits.

## I.  Qualifications

    I have attached my curriculum vitae which outlines my background and supporting qualifications in detail. I am currently licensed to practice law in four states including Pennsylvania, Maryland, New Jersey, and New York. I have represented hundreds of consumer bankruptcy debtors in their bankruptcy filings, many (or most) of which have had a mortgage related issue and/or mortgage foreclosure component. I typically represent mortgagor defendants in foreclosure cases.

## II. Background

The present action involves a claim seeking recovery from multiple defendants related to alleged violation of the Fair Debt Collection Practices Act, the Unfair Trade Practices and Consumer Protection Law, and Wrongful Use of Civil Proceedings ("Dragonetti") stemming from a foreclosure action in Wayne County Pennsylvania. The Plaintiffs herein, Christopher and Kelly Bainbridge were the mortgagors. U.S. Bank, N.A. as Trustee for the C-BASS Mortgage Loan Trust Asset-Backed Certificates, Series 2007-CB6 ("US Bank") was the mortgagee, Ocwen Loan Servicing, LLC ("Ocwen") was the servicer, and Udren Law Offices, P.C. ("Udren") were the attorneys of record for U.S. Bank and Ocwen.

As Mr. Pearlstein's report deals primarily with the Dragonetti claim, that is the focus of the report herein.

## III. Summary Relevant Facts

The Bainbridges had defaulted on their mortgage in 2010. (Deposition of Christopher Bainbridge, p. 45, line 13). As a result, on November 4, 2010, the Bainbridges filed a Chapter 13 bankruptcy petition (the "Petition") in the Middle District of Pennsylvania. (Docket No. 5:10-bk-09019-JJT).

On November 17, 2010, Litton Loan Servicing Servicing (the predecessor in interest to Ocwen) filed a Proof of Claim alleging a pre-petition[1] mortgage arrearage of $14,607.81. (Claims Register at Docket No. 5:10-bk-09019-JJT). There was no dispute as to the amount of the pre-petition arrearage. To the contrary, the Bainbridges proposed to cure this default through their Chapter 13 Plan. (First Amended Chapter 13 Plan, DE # 30 at 5:10-bk-09019-JJT).

On November 4, 2010, the day the Petition was filed, the bankruptcy attorney for the Bainbridges filed a Chapter 13 Plan. (Docket No. 5:10-bk-09019-JJT, Exhibit D-5 of Deposition of Christopher Bainbridge). In this Plan, the attorney indicated that the contractual monthly payment to Litton Loan was $1,160.00 per month. Id. The Bainbridges signed the Plan. Id. The actual payment due was $1,407.08 per month. (Claim No. 3, Docket No. 5:10-bk-09019-JJT).

The Bainbridges made their first post-petition[2] payment on December 21, 2010 in the amount of $1,400. (Deposition of Kelly Bainbridge, p. 64, line 21-22). This amount was less than the $1,407.08 required for the month of December, 2010. (Deposition of Kelly Bainbridge, p. 65, line 4).

---

[1] The term "pre-petition" refers to the time period prior to the filing of the bankruptcy petition, November 4, 2010.
[2] The term "post-petition" refers to the time period after filing the bankruptcy petition, November 4, 2010.

The Bainbridges made their second post-petition payment on January 7, 2011 in the amount of $1,160. (Deposition of Kelly Bainbridge, p. 65, line 8). This amount matches the original Chapter 13 Plan. (Deposition of Kelly Bainbridge, p. 65, line 18). Thus, the parties agree that as of January 7, 2011, there was a delinquency of $254.16. At that point, the Bainbridges began to make monthly payments in the correct amount of $1,407.08 each month. (Deposition of Kelly Bainbridge, p. 66, line 12).

On April 15, 2011, the Bainbridges filed their First Amended Chapter 13 Plan which proposed to pay the proper amount of $1,407.08 monthly to Litton Loan Servicing. This Plan was confirmed by the bankruptcy court on June 23, 2011.

Of note there is a substantial discrepancy between the Plan as filed and with the deposition testimony of Christopher Bainbridge. Namely, the Plan proposes to pay unsecured creditors a dividend of approximately 28%. Christopher Bainbridge testified that he paid his creditors in full, 100%. (Deposition of Christopher Bainbridge, p. 81, lines 11-12, 17-18, 23-25, p. 82, lines 1-3).

This leads to a larger issue. A Chapter 13 debtor has an affirmative duty to inform the Chapter 13 Trustee and his creditors of increases in income throughout the course of a Chapter 13 bankruptcy. When there is an increase in income, a debtor must file a supplemental income/expense schedule (Schedules I/J). Such a schedule would inform the Trustee and the creditors that more money is available for distribution. In such a case, the Trustee would ordinarily require a debtor to file a Motion to Modify a Confirmed Chapter 13 Plan in order to increase the dividend to unsecured creditors. That was not done here.

More problematic is that Christopher Bainbridge testified at his deposition that he was making more money than originally reported when he filed the bankruptcy petition and the original income schedule (Schedule I). More specifically, Mr. Bainbridge testified that in 2015 (during the Chapter 13 bankruptcy) he was making between $10,000-$15,000 per month. (Deposition of Christopher Bainbridge, p. 80, line 3). At the start of the bankruptcy in 2010, he was making only $60,000 per year. (Deposition of Christopher Bainbridge, p. 81, line 3). The testimony that he was only making $60,000 per year in 2010 corresponds with the original income schedule. However, no supplemental income schedule was ever filed reporting an increase in income. At a minimum, in 2015 when Mr. Bainbridge made between $10,000-15,000 per month, he would be required to supplement the schedules. He did not do so at any point during the bankruptcy.

These issues are problematic for the Bainbridges on a number of levels. First, where there is a failure to report increases in income, a Chapter 13 discharge can be denied or revoked. Second, if such a failure to report an increase in income is determined to be fraudulent (i.e. an attempt to pay creditors less than they are entitled to), the failure to report can be considered criminal. Indeed, failure to file inaccurate schedules can be considered perjury. Third, it appears facially that Mr. Bainbridge's conduct in his Chapter 13 bankruptcy and the testimony in his deposition are in patent conflict. Ultimately, his conduct and failure to report resulted in his creditors receiving only 28% of the total balance due when they were likely due 100% of their balance.

In October 2011, servicing rights to the Bainbridges' loan was transferred from Litton Loan Servicing to Ocwen Loan Servicing, LLC.

On July 18, 2013, Ocwen filed a Motion for Relief from Automatic Stay alleging a post-petition balance due from February 1, 2013 in the amount of $9,307.18. (Motion for Relief, DE # 57, Docket No. 5:10-bk-09019-JJT). The Bainbridges did not respond to this motion or otherwise contest this allegation. The bankruptcy court issued an Order granting the Motion on August 6, 2013. (DE # 60, Docket No. 5:10-bk-09019-JJT).

On January 2, 2014, Udren Law Offices, PC sent an Act 91 Notice to the Bainbridges on behalf of U.S. Bank alleging a balance due from September 1, 2013 in the amount of $7,299.20 with a suspense account balance of -$1,131.64. A foreclosure complaint was filed on June 26, 2014 claiming default from September 1, 2013.

A bench trial was held on or about March 13, 2015 before President Judge Raymond L. Hamill in the Wayne County Court of Common Pleas. Judge Hamill entered verdict in favor of the Bainbridges and against U.S. Bank. No appeal was taken.

On October 6, 2015, the Chapter 13 Trustee, Charles J. DeHart, III filed a Notice of Final Cure mortgage Payment. (DE # 67, Docket No. 5:10-bk-09019-JJT). The parties agree that the Trustee did in fact pay the entire pre-petition arrearage balance.

Then, on October 12, 2015, William Miller, Esq. filed a Response to this Notice alleging a post-petition debt. The Bainbridges did not object to this response nor did the Bainbridges request a hearing to determine whether the Response was accurate.

**IV. Statutory Provisions**

For the purposes of this report, the relevant statute is 42 Pa.C.S. § 8351(a), commonly referred to as the Dragonetti Act (the "Act").

Under the Act, a person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

(1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) the proceedings have terminated in favor of the person against whom they are brought.

**V. Report of Mark S. Pearlstein, Esq.**

The report of Mark S. Pearstein Esq. analyzes the facts of this case in the context of the Dragonetti Act. Ultimately, Mr. Pearlstein concludes that there were two violations of the Dragonetti Act. The first alleged violation relates to Attorney Miller's response to the 3002.1 Notice of Final Cure filed with the bankruptcy court. The second alleged violation relates to the pre-foreclosure requirements under Act 91.

Mr. Pearlstein's conclusions in this matter are not supported by the facts or by the law. My conclusions herein differ substantially. To that end, it is a legal impossibility that the Response to the 3002.1 Notice of Final Cure can form the basis of a Dragonetti action. Further, the facts support that the Act 91 Notice and subsequent foreclosure action were not performed in a grossly negligent manner, were based upon probable cause, and were not for any purpose other than adjudicating the debt owed to U.S. Bank. There is no evidence of any improper purpose.

I will also note that there are a number of statements or conclusions contained within the report that are incorrect. The inaccuracies of the report call into question the validity of the conclusions. For example, Mr. Pearlstein states that the Bainbridges' bankruptcy discharge was delayed by the filing of the Response to the 3002.1 Notice. (Pearlstein Report, p. 15). This is not even remotely accurate for several reasons. Namely, the Response to the 3002.1 Notice was filed on October 12, 2015. The discharge was entered on October 7, 2015. It is impossible that filing a Response delayed discharge since the discharge pre-dated the Response. Moreover, even if we assume *arguendo* that the Response pre-dated the discharge, a discharge would not be delayed due to such a Response. That is simply not the bankruptcy court's procedure. The discharge would be entered even if there was remaining or outstanding litigation.

**VI. Discussion**

    a) **A party's conduct in bankruptcy court cannot form the basis of a Dragonetti Action pursuant to well-established law in Pennsylvania.**

Mr. Pearlstein discusses at length how he believes the Response to the Rule 3002.1 Notice filed by Attorney Miller is a violation of the Dragonetti Act; however, this cannot be true. It is legally impossible for any action in bankruptcy court to form the basis of a Dragonetti Action. <u>Oberdick v. Trizechahn Gateway LLC, et. al.</u>, 168 A.3d 215 (Pa.Super. 2017) (citing <u>Stone Crushed Partnership v. Kassab Archbold Jackson & O'Brien et. al</u>., 908 A.2d 875 (Pa. 2006)).

This issue has been settled since the Pennsylvania Supreme Court has decided the case of <u>Stone Crushed Partnership</u> in 2006. In <u>Stone Crushed</u>, the state's highest court determined that the Bankruptcy Code has potential remedies available to compensate victims for abuse of process. As a result, the Bankruptcy Code preempts the Dragonetti Act. While abuse of process can occur in a bankruptcy proceeding, according to the Pennsylvania Supreme Court, it is the Bankruptcy Code – not the Dragonetti Act – which governs such remedy.

If any doubt as to this issue remained after <u>Stone Crushed</u>, the Superior Court removed all doubt in <u>Oberdick</u>. After a thorough analysis of <u>Stone Crushed</u>, the Court concluded that a victim of wrongful use of civil proceedings has equivalent if not greater protection under the Bankruptcy Code, the federal rules, and 28 U.S.C. § 1927 than under the Dragonetti Act. As a result, failure to pursue remedy in bankruptcy court necessarily precludes suit under Pennsylvania law. <u>Oberdick,</u>168 A.3d 215 at 221.

Thus, it is a legal impossibility that U.S. Bank and Ocwen are liable under the Dragonetti Act for filing an incorrect response to a Rule 3002.1 Notice. The Bainbridges never filed an Objection to the Response and never sought remedy for the improper filing. As a result, they are precluded from doing so now under well-settled Pennsylvania law.

    b) **The Act 91 Notice and foreclosure Complaint do not meet the rigorous standard for establishing a Dragonetti violation: (1) the actions were not grossly negligent; (2) there was probable cause for the actions; (3) the actions were not served for any reason other than to adjudicate the mortgage debt.**

As a threshold matter, Mr. Pearlstein's report seems to equivocate an incorrect allegation with a Dragonetti violation. It is possible for a pleading to have an incorrect allegation and yet not be grossly negligent It is possible for a pleading to have an incorrect allegation and yet still be based on probable cause. It is possible for a pleading to have an incorrect allegation and yet still be for the primary purpose of adjudicating a debt.

It is not enough to say that a pleading (or Notice) had an incorrect allegation contained therein. The fact that the amount stated on the Act 91 Notice or Complaint was ultimately incorrect does not obviate the fact that the mortgage was delinquent at the time that Act 91 Notice was served and at the time that the mortgage foreclosure complaint was filed. The parties do not dispute that the mortgage was delinquent. They merely dispute the level of delinquency.

More specifically, Kelly Bainbridge acknowledges that she underpaid in December 2010 and January 2011. (Deposition of Kelly Bainbridge, p. 64, line 21-22; p. 65, line 4, 8, 18). Thus, the parties agree that as of January 7, 2011, there was a delinquency of $254.16. There is no dispute as to this fact.

Ocwen has also stated that the Bainbridges also missed one full payment during that time period. While missing an additional payment certainly would add to Ocwen's justification of foreclosure, this additional payment is not necessary. The undisputed fact remains that as of January 2011, there was a delinquency of $254.16 which was never cured.

**1) The Act 91 Notice and foreclosure complaint were not grossly negligent.**

Mr. Pearstein's report concludes that the Act 91 Notice predates the Bainbridges' alleged delinquency. (Pearlstein Report, p. 18). As stated above, this is not accurate. The parties agree that at a minimum, there was a delinquency of $254.16 as of January 2011. While it is correct that the Act 91 Notice indicates an improper cure amount, the fact remains that there was a delinquency when the Notice was sent and that delinquency was more than 60 days delinquent.

Next, Mr. Pearstein states that alleging an amount higher than actually due constitutes grossly negligent conduct. (Pearlstein Report, p. 19). Again, this conflates a mistake with grossly negligent conduct. Even if there was a mistaken amount on the Act 91 Notice, this is not grossly negligent conduct.

Gross negligence is defined, *inter alia*, as a lack of slight diligence or care, or a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages. Black's Law Dictionary 1057 (7th ed.1999). Gross negligence has also been described as "the want of even scant care" and "the failure to exercise even that care which a careless person would use." <u>Ratti v. Wheeling Pittsburgh Steel Corporation</u>, 758 A.2d 695, 703; <u>see also</u> <u>W. Keeton, D. Dobbs, R. Keeton & D. Owens, Prosser and Keeton on Torts</u>, § 34 at 183 (5th ed.1984).

This definition considers that acting carelessly or making a mistake is not gross negligence. Gross negligence requires acting even more carelessly than a careless person.

It cannot be true that in this case, Ocwen or U.S. Bank acted in a grossly negligent manner. This arises from a simple fact: regardless of whether the Bainbridges were $254.16 delinquent or $7,299.20 delinquent – they were delinquent. Thus, regardless of whether the amount stated was incorrect, the result to the Bainbridges is/was the same. A foreclosure proceeding was the proper course of action when confronted with a delinquency of this nature. The extent of the delinquency is of no moment.

There is no evidence that there was gross negligence in this matter. Moreover an Act 91 Notice and subsequent foreclosure complaint were justified regardless of the extent of the debt since the parties agree that there was a delinquency which was over 60 days old.

The evidence cited by Mr. Pearstein in his report which allegedly supports a finding of gross negligence is based in large part upon conduct within the bankruptcy proceeding. (Pearlstein Report, p. 19-20). Mr. Pearlstein cites the Response to the 3002.1 Notice as well as the Motion for Relief filed with the bankruptcy court. Since this conduct cannot give rise to a Dragonetti claim for the reasons set forth above, it is clear that Mr. Pearlstein has not cited evidence supporting an allegation of grossly negligent conduct.

**2) The Act 91 Notice and foreclosure complaint were supported by probable cause.**

I rely upon the reasoning above to support the conclusion that the facts of this case leading to the Act 91 Notice and foreclosure complaint were supported by probable cause. Namely, there is no dispute that the Bainbridges were delinquent by $254.16, at a minimum.

However, in addition to this fact, there is another basis which supports a finding of probable cause. This results from the Bainbridges' failure to respond to the Motion for Relief filed in bankruptcy court.

The Bainbridges have argued now that the facts contained within the Motion for Relief were incorrect. Yet, despite this, the Bainbridges *never* contested the in bankruptcy court.

The failure of a debtor to contest a motion can be reasonably viewed as a tacit concession. In other words, failure to respond to a motion with incorrect facts can reasonably be viewed as either an inability to contest the facts or an agreement with those facts.

There were a number of opportunities within the bankruptcy proceedings for the Bainbridges to contest the allegations of post-petition default. For example, they could have answered the Motion for Relief. They could have moved to reconsider the Order granting relief. They could have moved to vacate the Order granting relief. They could have moved for an injunction on a foreclosure. They could have filed a motion for an accounting or to deem the mortgage current. None of these actions were taken. Confronted with this inaction, the belief of Ocwen or U.S. Bank that the mortgage was delinquent by several months was reasonable.

The Bainbridges' only response to their failure to take action is that their attorney did not keep them informed. While there is no way to know whether or not this is true, it is of no moment. Assuming for a moment that their attorney failed to inform them of a Motion for Relief, their remedy would be a malpractice action against the attorney. The fact that Ocwen and U.S. Bank viewed this failure to respond as a tacit concession is reasonable under the circumstances.

Because the failure to respond can reasonably be viewed as a tacit concession, it follows that there was probable cause to believe there was a post-petition delinquency even though the amount of the delinquency was ultimately incorrect.

### 3) The Act 91 Notice and foreclosure complaint were not served for any reason other than to adjudicate the mortgage debt.

Mr. Pearstein concludes that there was an "improper purpose" for pursuing the mortgage foreclosure because "this claim is not justified." (Pearstein Report, p. 23-24). There is no other basis for his conclusion. Thus, if the claim is justified, it is reasonable to conclude there is no "improper purpose".

As stated above, the claim is certainly justified. The parties agree that there was a delinquency over 60 days old. The parties merely disagree over the extent of that delinquency. Thus, it cannot be said that the claim is not justified.

Because it is clear that the claim is justified, Mr. Pearlstein's conclusion that there was an improper purpose does not withstand scrutiny. Where there is a justified claim of delinquency, pursuing a mortgage foreclosure action for the purpose of adjudicating the debt is a "proper adjudication".

Additionally, both Christopher and Kelly Bainbridge agreed that there was no reason to file the foreclosure suit other than for Ocwen and U.S. Bank to recoup on a loan which they thought was behind in payments. (Deposition of Kelly Bainbridge, p. 53, line 15); (Deposition of Christopher Bainbridge, p. 151, line 9). Thus, the Bainbridges have agreed that the purpose of the action was for proper adjudication of a debt and not for an "improper purpose" as alleged by the Plaintiffs.

### VII.   Conclusion

U.S. Bank and Ocwen did not act in violation of the Dragonetti Act for the reasons set forth above. My opinions are expressed to a reasonable degree of legal certainty. My CV is attached. If you need further comment on any matter, please do not hesitate to ask.

Very truly yours,
**ARM Lawyers**

BY: _____
Patrick J. Best, Esquire